UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

GREGG SALZMAN; and AVI ELISHIS,

                         Plaintiffs,

               -against-

NEAL SHER; MICHAEL ENGELBERG; and THE
AMERICAN CENTER FOR CIVIL JUSTICE, f/k/a THE
RAUL WALLENBERG CENTER FOR CIVIL
JUSTICE,

                       Defendants.

----------------------------------------------------------------X

Docket No:
16-cv-3790

**COMPLAINT**

Jury trial demanded

       Plaintiff, complaining of the defendants, by their attorneys, THE BERKMAN LAW

OFFICE, LLC, alleges for their complaint, upon information and belief, as follows:

**THE PARTIES**

       1.     At all times mentioned herein, the plaintiff, GREGG SALZMAN ("SALZMAN"),

is a natural person and is a citizen and resident of the State of Florida.

       2.     At all times mentioned herein, the plaintiff, AVI ELISHIS ("ELISHIS"), is a

natural person and is a citizen and resident of the State of New Jersey.

       3.     Upon information and belief, the defendant NEAL SHER ("SHER") is a natural

person and is a citizen and resident of the State of New York, City and County of New York.

       4.     Upon information and belief, SHER holds himself out as an attorney licensed to

practice law in the State of New York and in the United States District Court for the District of

Columbia, although he has been disbarred by the Bar of the District of Columbia. *See In re Sher,* 830 A.2d 1262 (D.C. 2003); *Matter of Sher,* 15 A.D.3d 123 (2d Dep't 2005),

5.     Upon information and belief, the defendant MICHAEL ENGELBERG ("ENGELBERG") is a citizen and resident of the State of New York, County of Nassau.

6.     Upon information and belief, the defendant ENGELBERG is trained pediatrician, but holds himself out as qualified to provide or arrange for legal representation to victims of terrorism.

7.     Upon information and belief, the defendant AMERICAN CENTER FOR CIVIL JUSTICE, INC. f/k/a/ THE RAUL WALLENBERG CENTER FOR CIVIL JUSTICE, is a not-for-profit corporation organized and existing under the laws of the State of New York, with its principal place of business located within the City, State and County of New York.

8.     Upon information and belief, SHER is, or holds himself out as, the General Counsel of the ACCJ.

9.     Upon information and belief, the office address of SHER and that of the ACCJ are the same.

## JURISDICTION AND VENUE

10.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, since the plaintiffs and the defendants reside in different states and the amount in controversy exceeds $75,000.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 since a substantial part of the events or omissions on which the claim is based occurred within the Southern District of New York.

## THE UNDERLYING FACTS

12.     Plaintiffs was injured in a suicide bombing attack carried out by the terrorist group Hamas on September 4, 1997.

13.     Also injured in that attack were the plaintiffs in *Rubin v. Islamic Rep. of Iran*, DC Dist. Ct. Docket no. 01-CV-1655.

14.     Shortly after the attack, in or about December 1998, plaintiffs were approached by Rabbi Eliezer Perr and Dr. Michael ENGELBERG, who claimed to be acting on behalf of an organization called Raul Wallenberg Center for Civil Justice, Inc., which they described as a not-for-profit entity that assisted victims of terrorism.

15.     Rabbi Perr and Dr. ENGELBERG told plaintiffs that they could represent them trying to get compensation for their injuries.

16.     Perr and ENGELBERG claim to have had plaintiffs sign a document giving Dr. ENGELBERG power of attorney, and another document that was an agreement with the Wallenberg Center to pay the Wallenberg Center a 20% contingency fee if they recovered money. The existence, validity, and enforceability of those documents is a matter of contention, but is not relevant to the dispute at hand. It is undisputed that the defendants purported to act with the authority of a power of attorney from 1998 until September 2015.

17.     Several years went by and plaintiffs heard nothing of substance from the Wallenberg Center.

18.     At some point, upon information and belief in or about 1999, it changed its name to the American Center for Civil Justice, Inc.

19.     On September 29, 2000 an attorney named John J. McDermott, Esq. from the firm Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., filed a complaint on plaintiffs' behalf,

commencing an action against Iran and related defendants, claiming that Iran had sponsored the terrorist organization that carried out the attack in which plaintiffs were injured.

20.     The action commenced by Mr. McDermott was *Campuzano, et al. v. Islamic Rep. of Iran, et al.*, D.C. Dist. Docket no. 00-cv-2328.

21.     Plaintiffs themselves did not retain Mr. McDermott, nor were they consulted about his retention.

22.     Plaintiffs were never provided a copy of McDermott's retainer agreement.

23.     The defendants in the defaulted and a default judgment hearing was held on January 6-9, 2003. The hearing was held in conjunction with another case, *Rubin v. Islamic Rep. of Iran*, DC Dist. Ct. Docket no. 01-CV-1655. The Rubin plaintiffs were represented by other counsel having nothing to do with the Wallenberg Center.

24.     At the end of the hearing, after the witnesses had testified, plaintiffs were informed that Mr. McDermott had been fired by the ACCJ. Plaintiffs were never told why. Although the docket reflects that Mr. McDermott never withdrew and is still listed as counsel of record, he did nothing after the hearing.

25.     On March 19, 2003, an attorney named Jacob Stein, Esq. filed a notice of appearance.

26.     Plaintiffs have never met Mr. Stein or spoken to him.

27.     From the docket it appears believe Mr. Stein filed the proposed findings and fact and conclusions of law on April 7, 2003.

28.     Judgment was entered on September 10, 2003 granting judgment for compensatory damages to Diana Campuzano in the amount of $18,952,725; Avi Elishis in the amount of $12,010,882.87; and Gregg Salzman in the amount of $10,000,000. In addition,

punitive damages in the amount of $37,500,000 were awarded to each plaintiff. The same judgment also made awards to the plaintiffs in *Rubin*.

29.     The docket reflects that Mr. Stein never withdrew and is still listed as counsel of record, but, as with Mr. McDermott, it does not appear he did anything after filing the proposed findings of fact and conclusions of law.

30.     After the judgment was entered, plaintiffs heard nothing of substance from the ACCJ, Rabbi Perr, Dr. ENGELBERG, Mr. McDermott, or Mr. Stein for years.

31.     The docket reflects that on March 27, 2008 an attorney named Paul Gaston, Esq. filed a motion for entry of final judgment, apparently seeking to take advantage of a new law that would have been advantageous to litigants in pending cases. That motion was denied on July 7, 2008 since the court found there already was a final judgment, and Mr. Gaston filed a notice of appeal on August 1, 2008. Apparently, that appeal was never perfected and on October 23, 2008 the D.C. Circuit Court of Appeals dismissed that appeal [DE 59]. Plaintiffs were not aware of the filing of this motion, the denial of the motion, the filing of the notice of appeal, or the dismissal of the appeal at any time before or contemporaneous with it happening. Plaintiffs never spoke with Mr. Gaston, nor were they even aware of his retention at the time he appeared in this action. Plaintiffs only know of these things now from reviewing the docket with my present attorney.

32.     The docket reflects that Mr. Gaston never withdrew and is still listed as counsel of record, but, as with Mr. McDermott and Mr. Stein, plaintiffs are not aware of him doing anything after making the filings described above.

33.     On April 30, 2008 yet another attorney filed a notice of appearance herein, Joshua Ambush, Esq. [DE 56].

34.     Plaintiffs were not aware of Mr. Ambush's retention or filing an appearance before or contemporaneous with its occurrence.

35.     Plaintiffs have been advised that at this time Mr. Ambush was employed by the ACCJ, but have no way to verify that.

36.     Plaintiffs have not been provided with any documentation regarding Mr. Ambush's retention or the terms thereof.

37.     It appears from the docket that Mr. Ambush initiated the process of serving the judgment that had been entered in 2003 on the defendant Islamic Republic of Iran, as required by 28 U.S.C. § 1608(e) in order for the judgment to be enforced.

38.     Service of the judgment is reflected on the docket entry of January 23, 2009 [DE 60].

39.     From the date judgment was entered in September 2003 until January 2009—a gap of over five years—plaintiffs' judgment had not been served and was unenforceable.

40.     The docket reflects that Mr. Ambush never withdrew and is still listed as counsel of record, but, as with Mr. McDermott, Mr. Stein, and Mr. Gaston, plaintiffs are not aware of him doing anything after making the filings described above.

41.     Indeed, Mr. Ambush is presently in litigation with the ACCJ. *Ambush v. Engleberg*, D.D.C. Docket 15-cv-1237, in which he accuses the ACCJ of many acts of fraud and malfeasance.

42.     The defendant SHER appeared as counsel for the plaintiffs in a judgment enforcement action commenced by others, *650 Fifth Avenue* case on March 1, 2010 (SDNY Docket no. 08-cv-10934, DE 82), and filed a claim on their behalf—which from all that appears constitutes nearly the only work done by Sher for the benefit of the plaintiffs. That claim was signed by both SHER and ENGELBERG.

43.     According to the docket in the plaintiffs' underlying case in DC, *Campuzano v. Islamic Rep. of Iran*, D.C. Dist. Docket no. 00-cv-2328, on November 23, 2011 another attorney, Neal Sher, Esq., filed an appearance as counsel for the plaintiffs, [DE 63 of that docket].

44.     Plaintiffs were not aware of Mr. Sher's appearance or retention before or contemporaneous with the filing of his appearance.

45.     Plaintiffs were not consulted about Mr. Sher's retention, nor have they ever executed a retainer with Mr. Sher, nor have they ever been provided with a copy of such a retainer if one was executed via a power of attorney.

46.     Mr. Sher has never consulted with the plaintiffs about any substantive aspect of their case.

47.     On November 22, 2011, Mr. Sher filed a motion for leave to enforce the 2003 judgment, as required by 28 U.S.C. § 1610(c). This application was made 98 months after the judgment was entered, and 37 months after the judgment was served on Iran.

48.     Thus, the plaintiffs' judgment <u>lay dormant for over eight years</u> with no collection efforts being made by the ACCJ, Dr. ENGELBERG, Rabbi Perr, or any of the parade of lawyers who supposedly were representing the plaintiffs.

49.     The motion for permission to enforce the judgment was granted by the Court on December, 19, 2011 [DE 65 of the *Campuzano* docket].

50.     Plaintiffs were not advised of the retention of Mr. Sher, or the motion for permission to enforce the judgment at any time before or contemporaneous with the filing of those documents. Plaintiffs were not told that the judgment was lying dormant, that it had not been served on Iran for five years, or that they had not obtained permission to enforce the judgment for over eight years after the judgment.

51.     Meanwhile, and unbeknownst to the plaintiffs at the time, another group of plaintiffs "represented" by the ACCJ, referred to as the "Heiser plaintiffs," were also bringing their case against Iran relating to the June 25, 1996 bombing at the Khobar Towers, a residence on a United States military base in Dhahran, Saudi Arabia. *Heiser v. Islamic Rep. of Iran,* D.C. Dist. Ct. Docket nos. 00-2329 and 01-2104.

52.     That the Heiser Plaintiffs were "clients" of the ACCJ has been admitted by the defendant ENGELBERG in a complaint he has filed against the ACCJ alleging breach of fiduciary duties and other malfeasance by the ACCJ, Rabbi Perr, his son Jed Perr, and others, *Engelberg v. Perr,* Nassau County Index no. 60619/14 (Ex. A, complaint, p. 13; See generally Ex. F, order denying motion to dismiss).

53.     The Heiser case also proceeded to a default judgment and a default hearing was held in December 2003. A judgment was entered in 2006, *Estate of Heiser v. Islamic Rep. of Iran,* 466 F. Supp. 2d 229 (D.D.C. 2006).

54.     The Heiser case had a large number of plaintiffs, and resulted in a judgment of approximately $590 million collectively, including compensatory and punitive damages.

55.     The docket of the Heiser case, 00-2329, reflects that originally Mr. McDermott was counsel for the plaintiffs, but was substituted out on February 20, 2003, shortly before the hearing in plaintiffs' case.

56.     The new lawyers who took over in *Heiser* were the firm DLA Piper. [*Heiser* DE 14].

57.     In *Heiser,* the judgment was entered on December 22, 2006 [*Heiser* DE 134]. It was immediately served on the defendants as required, and a notice of such service was docketed on September 28, 2007 [*Heiser* DE 135]. DLA Piper filed a motion to enforce the judgment on

December 12, 2007 [*Heiser* DE 136] and that motion was granted on February 7, 2008 [*Heiser,* DE 137].

58.     Thus, even though plaintiffs' judgment was entered three years <u>before</u> the *Heiser* judgment, the *Heiser* plaintiffs had the judgment all entered and served, and had obtained permission to enforce it, nearly four years <u>before</u> the same was achieved in plaintiffs' case.

59.     Plaintiffs' case should have been seven years ahead of *Heiser* in enforcement, but after the judgment was entered plaintiffs' case received next to no attention, while the ACCJ people were obviously focusing on *Heiser*, which is a much bigger case because it involved many more plaintiffs, and involved deaths, rather than injuries.

60.     Indeed, in 2007, ENGELBERG and the ACCJ entered into a new retainer with DLA Piper to handle proceedings to enforce the Heiser judgment, a copy of which is publically available on the docket of *Engelberg v. Perr,* and is attached hereto as Ex. C. This retainer notes that the ACCJ represents or "controls judgments" of other judgment-creditors of Iran, but specifically provides that DLA Piper will make no efforts to enforce such other judgments until the Heiser judgment is paid in full. (Ex. C).

61.     In 2011 ENGELBERG and the ACCJ entered into another retainer with DLA Piper to handle proceedings to enforce the Heiser judgment, a copy of which is also publically available on the docket of *Engelberg v. Perr,* and is attached hereto as Ex. D. Again, this retainer notes that the ACCJ represents or "controls judgments" of other judgment-creditors of Iran, but specifically provides that DLA Piper will make no efforts to enforce such other judgments until the Heiser judgment is paid in full. (Ex. D).

62.     The docket reflects that collection proceedings in the *Heiser* case have been vigorous, with filing of *lis pendens*, a writ of garnishment, numerous writs of attachment, and the like—over 140 docket entries since the judgment was entered, plus appeals. In addition, a

Google or Westlaw search reveals that there are numerous and aggressive supplemental proceedings pending to enforce the *Heiser* judgment.

63.    The enforcement proceedings undertaken by the defendants on behalf of the Heiser plaintiffs include the matter of *Peterson v. Islamic Rep. of Iran*, S.D.N.Y 10-cv-4518, a proceeding in which close to $2 <u>billion</u> of Iranian assets were seized and will shortly be distributed to a group of judgment creditors of Iran including the Heisers, and including the Rubin plaintiffs who were injured in the same attack as the plaintiffs and whose judgment was obtained at the same hearing as the plaintiffs'. The Supreme Court has affirmed the distribution of the funds in Peterson, *Markazi. Bank Markzi v. Peterson*, ___ U.S. ___, ___ S. Ct. ___, 14-770 (Apr. 20, 2016), and specifically noted the omission of the plaintiffs:

> The 16 judgments include: *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (DC 2012); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (DC 2010); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (DC 2010) (granting judgment in consolidation of four actions at issue here: *Valore*, No. 1:03–cv–01959; *Bonk v. Islamic Republic of Iran*, No. 1:08–cv–01273; *Spencer v. Islamic Republic of Iran*, No. 1:06–cv–00750; and *Arnold v. Islamic Republic of Iran*, No. 1:06–cv–00516); *Estate of Brown v. Islamic Republic of Iran*, No. 1:08–cv–00531 (D DC, Feb. 1, 2010); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15 (DC 2008); *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1 (DC 2008); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200 (DC 2008); *Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1 (DC 2007); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (DC 2006); *Estate of Bland v. Islamic Republic of Iran*, No. 1:05– cv–02124 (D DC, Dec. 6, 2006); *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90 (DC 2006); ___***Campuzano v. Islamic Republic of Iran***___, ___**281 F. Supp. 2d 258 (DC 2003) (awarding judgment in both the**___ ***Rubin*** ___**action,**___ ***Rubin v. Islamic Republic of Iran***___**, No. 1:01–cv–01655, the plaintiffs of which are respondents here, and the**___ ***Campuzano*** ___**action, the plaintiffs of which are not**___); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (DC 2003). Three additional groups of plaintiffs with claims against Iran were voluntarily dismissed from the instant litigation after "informing the [District Court] that none of the plaintiffs in those actions ha[d] obtained judgments for damages against Iran." App. to Pet. for Cert. 19a.

*Id.*, n.5 (emphasis added).

64.     Thus, all the plaintiffs in that action—the plaintiffs/judgment-creditors in 16 different actions against Iran—will be receiving a share of the recovery, including the *Heisers.* The instant plaintiffs, however, will receive nothing—for no good reason at all, since their judgment pre-dated the *Heiser* judgment by years and there is no valid reason why they were not included.

65.     The Peterson case includes numerous judgment creditors of Iran, including the *Heiser* plaintiffs, as well as plaintiff groupings referred to as *Silvia and Valore,* whose case had a 2006 docket number; *Wultz*, whose case had a 2008 docket number; *Bland*, whose case had a 2005 docket number; *Bonk,* whose case had a 2008 docket number; *Levin,* whose case had a 2005 docket number; and *Greenbaum, Acosta, Beer* and *Kirshenbaum,* whose cases had docket numbers of 2002, 2003, 2006 and 2008.

66.     Indeed, one of the plaintiff groups that will be receiving money, the *Wultz* plaintiffs, were latecomers, only having received their judgment against Iran in 2012, then moving to intervene in 2013 [Peterseon DE 329] and were able to reach a settlement with the other judgment creditors by May 22, 2013 [Peterson DE 407].

67.     Despite the Wultz plaintiffs having provided a motion that could have been copied verbatim by the defendants on behalf of the plaintiffs, the defendants did nothing and allowed the Wultzes to participate in the Peterson settlement and never enforced the rights of the plaintiffs.

68.     The instant plaintiffs already had their judgment by 2003, and should have had priority over all the claimants in the Peterson case. For no good reason, the ACCJ and Dr. ENGELBERG failed to include the plaintiffs in the Peterson case, and they lost their opportunity to get a share of the nearly $2 billion that will shortly be divided.

69.     Not having been included in the *Peterson* matter has cost the plaintiffs what would have been their share of the recovery in *Peterson,* upon information and belief several million dollars.

70.     There have been no supplemental proceedings to enforce plaintiffs' judgment.

71.     It was a further betrayal, conflict, and breach of fiduciary duty when, on July 14, 2011, the same date as the second DLA Piper retainer, Rabbi Perr's son, Jed Perr, writing on behalf of the ACCJ, informed the plaintiffs of the DLA Piper retainer in a most misleading manner. A copy of the letter is attached as Ex. E. It says that the ACCJ would engage DLA Piper, but since they had been representing the plaintiffs in *Heiser* there was a "legal and ethical constraint which obligates them to provide the Heiser Judgments creditors with full satisfaction before you receive the amount of your judgment." (Ex. E, p. 1). Entirely absent from that letter was any mention of the fact that it was the ACCJ that hired DLA Piper for the Heisers, that they did so years after plaintiffs already had a judgment in their case, and that they had neglected to timely serve the plaintiffs' judgment or obtain the court permission necessary to enforce it. Far from being a disclosure, this letter was a scam and a lie, generated by the ACCJ's unprofessional conduct and conflict of interest—an effort to sweep under the rug that they had sold the plaintiffs out to the Heiser plaintiffs.

72.     An August 18, 2014 email from DLA Piper attorney Shale Stiller, Esq. confirms that Dr. ENGELBERG and Rabbi Perr had been advised by DLA Piper in 2011 that they could not represent non-Heiser plaintiffs in the United States. (Ex. F). This conflict was never disclosed to the plaintiffs contemporaneous with it being revealed to Dr. Engelberg and Rabbi Perr.

73.     The same thing happened with judgment enforcement efforts in Canada. In an email dated June 20, 2014, Mr. Stiller of DLA Piper advised the plaintiffs that DLA Piper was

unable to represent anyone besides the Heisers in Canada. (Ex. G). Yet the defendant SHER is the General Counsel of the ACCJ, and is thus presumably privy to whatever enforcement proceedings are DLA Piper is conducting in Canada. Plaintiffs were never advised that we were being made second fiddle in Canada contemporaneous with DLA Piper refusing to represent them there.

74.     As of this moment, plaintiffs have no idea what proceedings are being undertaken on their behalf in Canada.

75.     It did not need to be this way. Compare, for example, the agreement entered into by DLA Piper with Perr and ENGELBERG to pursue judgment enforcement proceedings in the UK, a copy of which was provided by DLA Piper. (Ex. H). This agreement was signed by Dr. ENGELBERG on behalf of the plaintiffs and also on behalf of the Heiser plaintiffs, and on behalf of numerous other plaintiffs, plus a few more for whom Rabbi Perr signed. The agreement provides simply that any recovery will be pro-rated between the claimants. This exact agreement that DLA Piper agreed to for the UK could have been made with DLA Piper globally had the ACCJ, Rabbi Perr, and Dr. ENGELBERG not abandoned the instant plaintiffs in the first place. Indeed, because the instant plaintiffs had their judgment in 2003, enforcement proceedings should have been commenced on their behalf years before the Heisers even had their judgment, and it would have been the Heisers who would have been asking to join! In short, the instant plaintiffs got thrown under the bus, and Mr. Sher, the ACCJ, Rabbi Perr and Dr. ENGELBERG have utterly breached their fiduciary duties to them.

## AS AND FOR A FIRST CLAIM FOR RELIEF

76.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

77.     The defendant ENGELBERG claims to have been granted a power of attorney by the plaintiffs. The existence, enforceability, and validity of that power of attorney is a subject of dispute, but there is no dispute that the defendant ENGLEBERG has purported to act under the authority of such a power of attorney.

78.     That claimed power of attorney was granted to ENGELBERG in conjunction with his relationship with ACCJ.

79.     A power of attorney is a form of agency. New York Law provides that "an agent acting under a power of attorney has a fiduciary relationship with the principal. General Obligations Law § 5-1505(2)(a).

80.     That statute goes on to mandate that:

The fiduciary duties include but are not limited to each of the following obligations:

(1) To act according to any instructions from the principal or, where there are no instructions, in the best interest of the principal and to avoid conflicts of interest.
General Obligations Law § 5-1505(2)(a)(1)

81.     Eighty-eight years ago, Justice Cardozo put it more colorfully: "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458 (N.Y. 1928).

82.     Thus duty extended to the ACCJ, since the power of attorney granted to ENGELBERG related to ENGELBERG's being part of the ACCJ.

83.     This duty also extends to SHER, who is general counsel for ACCJ, has appeared as counsel for the plaintiffs in their case in Washington, has appeared as counsel for the Heisers, for example in *In Re: 650 Fifth Avenue and Related Properties*, SDNY Docket no. 08-cv-10934, and has executed documents on behalf of the Heisers (Ex. C, D).

-14-

84.     This duty of loyalty obligated the defendants to invest their best efforts on behalf of the plaintiffs, or at least efforts equivalent to the efforts they invested on behalf of their other clients / principals.

85.     The defendants breached their fiduciary duties to the plaintiffs, inter alia, by:

a.      By failing to pursue enforcement of the plaintiffs' judgment, while affirmatively pursuing enforcement of other judgment creditors of Iran who had equivalent or even inferior claims, the defendants breached their fiduciary duties to the plaintiffs.

b.      By pursuing judgment enforcement on behalf of other clients / principals, and not on behalf of the plaintiffs.

c.      By failing to inform the plaintiffs of their conflict of interest and to offer them an opportunity to retain alternate counsel, in general and specifically in the *Peterson* case where the plaintiffs should have had exactly the same standing as the Rubin plaintiffs, who were included.

d.      By lying to the plaintiffs about their efforts and falsely telling them that the law required the Heisers to have priority.

e.      By effectively abandoning the plaintiffs.

86.     The defendants' breach of their fiduciary duties to the plaintiffs caused them to be damaged in that their judgment remains unenforced, they have made no monetary recovery, and their judgment has been subordinated in multiple enforcement efforts to the judgment of the Heiser plaintiffs.

87.     Among the damages suffered by the plaintiffs was their exclusion from the *Peterson* case. Had they been included in that case and received a share of the recovery prorated against the compensatory damages awards of the other judgment creditors who participated in

-15-

that case, the plaintiffs' shares would have come to $5.04 million for Salzman and $6.05 million for Elishis, $11.09 million collectively.

88.     By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages.

## AS AND FOR A SECOND CLAIM FOR RELIEF

89.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

90.     The defendants were reckless, careless, and negligent in their representation of the plaintiffs in that they failed to pursue enforcement of the plaintiffs' judgment, while affirmatively pursuing enforcement of other judgment creditors of Iran who had equivalent or even inferior claims; pursued judgment enforcement on behalf of other clients / principals, and not on behalf of the plaintiffs; failed to inform the plaintiffs of their conflict of interest and to offer them an opportunity to retain alternate counsel, in general and specifically in the *Peterson* case where the plaintiffs should have had exactly the same standing as the Rubin plaintiffs, who were included; lied to the plaintiffs about their efforts and falsely told them that the law required the Heisers to have priority; effectively abandoning the plaintiffs; failed to inform plaintiffs that they were acting outside their competence zone; failed to properly conduct due diligence; failed to inform plaintiffs that they should seek advice of other counsel; failed to comply with applicable statutes, laws, rules and regulations; failed to have efficient and sufficient personnel; failed to comport themselves reasonably and prudently; failed to warn plaintiffs of the dangers and perils; and the defendants were otherwise reckless, careless and negligent.

91.     The defendants' negligence caused plaintiffs to be damaged in that their judgment remains unenforced, they have made no monetary recovery, and their judgment has been subordinated in multiple enforcement efforts to the judgment of the Heiser plaintiffs.

92.     Among the damages suffered by the plaintiffs was their exclusion from the Peterson case. Had they been included in that case and received a share of the recovery prorated against the compensatory damages awards of the other judgment creditors who participated in that case, the plaintiffs' shares would have come to $5.04 million for Salzman and $6.05 million for Elishis, $11.09 million collectively.

93.     By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages.

## AS AND FOR A THIRD CLAIM FOR RELIEF

94.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

95.     The defendant SHER holds himself out as an attorney licensed to practice law.

96.     The defendant SHER appeared as counsel for the plaintiffs in the *650 Fifth Avenue* case on March 1, 2010 (SDNY Docket no. 08-cv-10934, DE 82), and filed a claim on their behalf—which from all that appears constitutes the only work done by Sher for the benefit of the plaintiffs, other than signing a settlement stipulation agreeing to divide whatever is recovered in the 650 case on a prorated basis along with many other judgment holders (Ex. I). That claim was signed by both SHER and ENGELBERG.

97.     Importantly, in the 650 Fifth Avenue matter, Mr. Sher represented multiple other plaintiffs as well.

98.     The defendant SHER appeared as counsel for the plaintiffs in the plaintiffs underlying case in Washington, DC on November 23, 2011.

99.     SHER was discharged as counsel by the plaintiffs on or about September 17, 2016

100.    Thus, SHER was counsel of record for the plaintiffs for approximately six years.

101.    During those six years, SHER did next to nothing for the plaintiffs.

102.    During those six years, SHER operated under a conflict of interest, and gave his loyalty to other clients, subordinating the interests of the plaintiffs to those other clients.

103.    As counsel for the plaintiffs, SHER had a duty to truthfully advise them of their rights, including to inform them that the ACCJ and ENGELBERG were acting against their interests, that what they were being told about the second agreement plaintiffs were asked to sign with ACCJ were misleading lies, and that the entire arrangement was dubious.

104.    During those six years, SHER failed to truthfully advise the plaintiffs of their rights.

105.    During those six years, SHER failed to truthfully advise the plaintiffs of the conflict of interest.

106.    The defendant SHER was reckless, careless, and negligent, and failed to act in accordance with good and accepted legal practice, in that he: failed to properly advise failed to maintain a legal file; failed pursue enforcement of the plaintiffs' judgment, while affirmatively pursuing enforcement of other judgment creditors of Iran who had equivalent or even inferior claims; pursued judgment enforcement on behalf of other clients / principals, and not on behalf of the plaintiffs; failed to inform the plaintiffs of their conflict of interest and to offer them an opportunity to retain alternate counsel, in general and specifically in the *Peterson* case where the plaintiffs should have had exactly the same standing as the Rubin plaintiffs, who were included; failed to inform plaintiffs that they were acting outside his competence zone; failed to properly conduct due diligence; failed to inform plaintiffs that they should seek advice of other counsel; failed to comply with applicable statutes, laws, rules and regulations; failed to have efficient and sufficient personnel; failed to comport himself reasonably and prudently; failed to warn plaintiffs of the dangers and perils; and was  otherwise reckless, careless and negligent.

-18-

107. SHER's malpractice caused plaintiffs to be damaged in that their judgment remains unenforced, they have made no monetary recovery, and their judgment has been subordinated in multiple enforcement efforts to the judgment of the Heiser plaintiffs.

108. Among the damages suffered by the plaintiffs was their exclusion from the Peterson case. Had they been included in that case and received a share of the recovery prorated against the compensatory damages awards of the other judgment creditors who participated in that case, the plaintiffs' shares would have come to $5.04 million for Salzman and $6.05 million for Elishis, $11.09 million collectively.

109. By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

110. Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

111. The defendant SHER colluded with the ACCJ to prioritize enforcement of the Heisers' judgment over the plaintiffs' judgment, all the while deceitfully failing to inform the plaintiffs of the conflict of interest.

112. Pursuant to NY Judiciary Law § 487:

An attorney or counselor who:

1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;  or,

2. Willfully delays his client's suit with a view to his own gain;  or, willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

*Id.*

113.    SHER's deceit and collusion caused plaintiffs to be damaged in that their judgment remains unenforced, they have made no monetary recovery, and their judgment has been subordinated in multiple enforcement efforts to the judgment of the Heiser plaintiffs.

114.    Among the damages suffered by the plaintiffs was their exclusion from the Peterson case. Had they been included in that case and received a share of the recovery prorated against the compensatory damages awards of the other judgment creditors who participated in that case, the plaintiffs' shares would have come to $5.04 million for Salzman and $6.05 million for Elishis, $11.09 million collectively.

115.    By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages, trebled pursuant to Judiciary Law § 487.

**WHEREFORE**, the plaintiffs demand judgment against the defendants in the amounts and for the relief requested herein, plus such preliminary and injunctive relief as may be permitted by law and/or equity or the court's inherent powers, all in addition to such attorney's fees as may be recovered by law.

Dated:    Brooklyn, New York
          May 20, 2016

                                        Yours,

                                        THE BERKMAN LAW OFFICE, LLC
                                        *Attorneys for the plaintiffs*


                                        by:   _____
                                              Robert J. Tolchin

                                        111 Livingston Street, Suite 1928
                                        Brooklyn, New York 11201
                                        (718) 855-3627